UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

In re:                                              Chapter 11

JURGIELEWICZ DUCK FARM,                             Case No. 10-70231 (DTE)

Debtor.

-----------------------------------------------------------------

## DEBTOR'S EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 FOR INTERIM AND FINAL FINANCING ORDERS (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING SECURED BY A SENIOR LIEN UNDER SECTION 364(D) OF THE BANKRUPTCY CODE AND UTILIZE CASH COLLATERAL, (II) MODIFYING THE AUTOMATIC STAY, AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)

Jurgielewicz Duck Farm as debtor and debtor-in-possession (the "Debtor"), respectfully represents:

### Background

1.      The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on **January 12, 2010** (the "Petition Date").

2.      The Debtor has continued in possession of its property and the operation and management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No trustee or examiner, and no official committee has been appointed in the Debtor's case.

4.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  This application has been referred to this Court for consideration pursuant to §157 of the Judicial Code and the

Standing Order of Referral of Cases to Bankruptcy Judges (E.D.N.Y. August 8, 1986

(Weinstein, C.J.)

**Background.**

     5.     The Debtor, which was established in 1919, operates a free range duck

farm from the premises located at 68 Barnes Road, Moriches, New York.

     6.     The Debtor is one of the five major producers of White Peking Ducklings

in the country and is the only producer of Free Range Long Island Ducklings in the

United States.  It is the largest duck producer on Long Island, NY.   While the Debtor

owns the land from which the farm operates, the town and counties of Brookhaven and

Suffolk purchased the development rights to the farm land in May 2007.

**Capital Structure.**

     7. The Debtor owns several parcels of real property in New York from which it

operates its farm and a house located approximately five (5) miles from the main farm.

The Debtor also owns three (3) parcels of property in Ohio.  Each of the parcels of real

property is encumbered by a mortgage.  The following are the Debtor's secured

creditors[1]: (1) Bellwether LLC holds a claim in the estimated amount of $500,000 which

claim is secured on 4 acres of farm land and the home located at 7 Widgeon Road, Center

Moriches, New York[2]; (2) Cargill Inc. holds a claim in the approximate amount of

$331,837.26 which claim is secured on 176 acres of real property located in Wayne,

Ohio; (3) First Pioneer Farm Credit, ACA, holds a claim in the amount of $875,913.00

---

[1] GMAC is scheduled as a secured creditor in connection with a 2004 Chevy Tahoe owned by the Debtor and Evergreen 9 Corp. is scheduled as a secured creditor in connection with purchase order financing it provided to the Debtor pre-petition.  Neither GMAC nor Evergreen 9 Corp. are secured on any other real or personal property of the Debtor.

[2]     Benjamin Jurgielewicz, the Debtor's general partner, resides in the home located at 7 Widgeon Road.

which claim is secured by a mortgage on two (2) parcels of real estate consisting of

approximately 35.4 acres of land from which the Debtor operates its farm. First Pioneer

also has a security interest in all of the Debtor's personal property; (4) Kalmbach Feeds

Inc. which holds a claim in the amount of $373,618.87 and which is secured on two (2)

parcels of real estate consisting of approximately 132 acres of land in Wayne, Ohio and

2.2 acres of farm land at Barnes Road, Moriches, New York; (5) Titmus Enterprises

which holds a claim in the approximate amount of $1,101,000 and which is secured by a

mortgage on two (2) parcels of real estate consisting of approximately 14.8 acres of farm

land located at Barnes Road, Moriches, New York. Titmus commenced a foreclosure

proceeding against the Debtor and obtained a judgement of foreclosure in December

2009, prior to the Petition Date.

        8.     The balance of the Debtor's other obligations are for real estate taxes

scheduled in the amount of $138,948.94 and unsecured obligations, generally consisting

of trade debt, contract and lease obligations (including possible rejection damages),

employee obligations, specifically in connection with workers compensation obligations,

scheduled in the aggregate amount of $2,837,180.88. The Debtor is also the defendant in

various litigations, including litigation regarding the Debtor's compliance with New York

State environmental regulations which claim amounts are currently unliquidated.

**Events Leading to the Debtors' Chapter 11 Cases.**

        12.    While the Debtor's duck product is in high demand, increased feed and

fuel costs negatively impacted the Debtor's cash flow and led to an inability to pay its

debts as they came due. The Debtor was soon unable to obtain credit terms from its feed

vendor, which vendor required cash on delivery payments, further limiting the Debtor's

cash flow and inhibiting any ability for the Debtor to accumulate sufficient cash to increase its duck production, which would in turn increase its profitability. Prior to the Petition Date, the Internal Revenue Service imposed against South Shore Packers, Inc., the Debtor's companion case, which levy was executed improperly against the Debtor's vendors, further limiting the Debtor's cash flow. At that juncture, the Debtor , after consultation with its advisors, determined that a chapter 11 filing was its best strategic alternative and would best serve the interests of its creditors, employees, and customers.

**Relief Requested**

14. By this Motion, the Debtor respectfully requests, pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of interim and final orders for the, *inter alia*:

> (a) authorization, under sections 364(c)(1), (2) and (3) of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor to obtain postpetition financing (the "Postpetition Financing") in the form of a revolving credit facility up to a maximum outstanding principal amount of $400,000 (the "Total Facility"), in accordance with the proposed Debtor –in-Possession Credit Agreement among the Debtor, as borrower, and Couak Capital Corp. Inc. ("Couak"), as lender (the "Lender"), substantially in the form of Exhibit "A" annexed to the Motion (the "Debtor in Possession Credit Agreement"), this Order, the final order authorizing the postpetition financing (the "Final Financing Order") and all other agreements, documents and instruments at any time evidencing, guaranteeing or securing the Obligations[3] or the Collateral (as defined hereinafter) (collectively, the "Loan Documents");

> (b) authorization to grant to the Lender assurances for the full and timely payment by and performance of the Obligations of the Debtor to the Lender in connection with such Interim Financing and Final Financing under the Debtor in Possession Credit Agreement, including, without limitation, all principal, interest, costs, fees and expenses, all as set forth in the Loan Documents, by granting to the Lender (i) pursuant to section

---

[3] All terms not otherwise defined in this Order shall have the meanings ascribed to them in the Debtor in Possession Credit Agreement.

364(c)(1) of the Bankruptcy Code, an administrative expense allowable under section 503(b) of the Bankruptcy Code having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code, and (ii) pursuant to sections 364(d) of the Bankruptcy Code, a senior security interest in and lien on with first priority all of the Debtors assets as set forth in section 6.1 of the Debtor in Possession Credit Agreement, except for the Debtor's real property (collectively, and as further defined in the Loan Documents, the "Collateral");

(c) scheduling and approving the form and method of notice of the Final Hearing.

### The Debtors' Efforts to Obtain Financing.

15.     The Debtor does not have any currently available sources of funds other than the Cash Collateral of First Pioneer and the proposed post-petition financing (the "DIP Financing") to carry on the operation of its business. The Debtor urgently requires working capital to continue its operations and to increase its production capabilities. The Debtor's current cash flow shortfalls have limited its ability to operate at full capacity. Currently the Debtor operates with sales of 8,000 ducks per week. Debtor submits that increasing its production to 12,000 ducks per week will move the Debtor to a net profitable position. Further, continued uncertainty concerning the Debtor's financial condition may curtail the Debtor's availability of credit and acceptable credit terms. More specifically, the Debtor's ability to maintain business relationships with its vendors and suppliers, to purchase new inventory, and otherwise to finance its operations is dependent on its ability to use cash collateral and obtain the funds made available under the DIP Financing.

16.     Any potential disruption of the Debtor's operations would be devastating at this critical juncture. The inability of the Debtor to obtain sufficient liquidity and to make payments on certain obligations on a timely basis may result in a permanent and

irreplaceable loss of business, causing a loss of value, to the detriment of the Debtor and all parties in interest. In light of the foregoing, the Debtor has determined, in the exercise of their sound business judgment, that a post-petition credit facility, which permits the Debtor to obtain up to $400,000 in financing, and to use such credit to finance the operation of its business, is critical to its ongoing operations, including the potential for increased production, which will increase sales and, Debtor submits will result in increased profitability.

17. Prior to the Petition Date, the Debtor surveyed various sources of financing, including applying for federal loan funds from the FSA, which application remains pending. Debtor also sought additional financing from both new and existing lenders. The Debtor concluded that the debtor in possession financing offered by Couak presented the best and most practical option available and would enable the Debtor to preserve its value as a going concern. The proposal received from the Lender is competitive and addresses the Debtor's working capital and liquidity needs.

**Debtor in Possession Credit Agreement**

18. Prior to and after the Petition Date, the Debtor engaged in good-faith and extensive, arm's-length negotiations with the Couak. These negotiations culminated in an agreement by the Couak to provide post-petition financing on the terms and subject to the conditions set forth in the Debtor in Possession Credit Agreement and the Interim Order. A copy of the Interim Order is annexed hereto as Exhibit "B".

19. The significant elements of the Loan Documents[4] and the proposed interim and final financing orders, are as follows:

---

4 This summary is qualified in its entirety by reference to the provisions of the Loan

(a) **Debtor**. Jurgielewicz Duck Farm

(b) **Guarantors**. . Jurgielewicz Estates, LLC; Jurgielewicz Trucking, LLC; and Jurgielewicz Hatcheries, LLC.

(c) **Commitment and Availability.** The Debtor in Possession Credit Agreement provides for an available revolving credit facility of $400,000 in the aggregate

(d) **Term.** The earlier of (a) December 31, 2010 or (b) at any time, without notice to Borrower, after the occurrence and during the continuation of a default.

(e) **Purpose** For the purposes set forth in section 1.1(b) of the Debtor in Possession Credit Agreement including (i) to pay expenditures described in the Budget or, with Lender's consent after the occurrence of an Event of Default, to fund the cost of an orderly liquidation of the Collateral to the extent approved by Lender; (ii) to pay fees required to be paid to the office of the United States Trustee or Debtor's legal counsel in an amount not to exceed $75,000.00; (iii) to pay any of the Obligations; (vi) to pay other expenses approved by Lender in its sole discretion. Notwithstanding anything to the contrary contained herein, in no event shall proceeds of Post-Petition Loans be used to pay any Professional Expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (i) invalidating, setting aside, avoiding or subordinating, in whole or in part, any of the Obligations or Liens and security interests in any of the Collateral granted to Lender under this Agreement or the Financing Order; (ii) declaring any of the DIP Financing Documents to be invalid, not binding or unenforceable in any respect, (iii) preventing, enjoining, hindering or otherwise delaying Lender's enforcement of any of the DIP Financing Documents or any realization upon any Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any of the Financing Orders); (iv) declaring any Liens granted or purported to be granted under any of the DIP Financing Documents to have a priority other than the priority set forth therein; or (v) objecting to the amount or method of calculation by Lender of any of the Obligations. Nothing in this Section 1.1 (b) shall be construed to waive Lender's right to object to any requests, motions or applications made in or filed with the Court, including any applications for interim or final allowances of Professional Expenses.

(f) **Priority and Liens**. Subject to the Carve-Out to pay the fees of the United States Trustee and the Debtor's bankruptcy counsel in an amount not to exceed $75,000. Pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code, all of the Obligations shall be secured by a first priority priming security interest in, and lien on, all of the assets (tangible, intangible, real, personal or mixed) of the Borrower, whether now owned or hereafter acquired, including, without limitation, Accounts, documents,

Documents.

inventory, equipment, capital stock in subsidiaries, investment property, instruments, Chattel Paper, commercial tort claims, cash, cash equivalents, securities accounts, deposit accounts, commodity accounts, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action and other General Intangibles, and all products and proceeds thereof (collectively, the "Postpetition Collateral"), subject only to (i) the Carve-Out and (ii) valid, perfected, enforceable and non-avoidable liens as of the Petition Date under the Mortgages as set forth on Exhibit C annexed hereto. To secure the prompt and Full Payment and performance of all of the Obligations, Borrower hereby grants to Lender, a continuing security interest in and Lien upon all of the following Property and interests in Property of such Borrower, whether now owned or existing or hereafter created, acquired or arising (irrespective of whether the same existed on or was created or acquired after the Petition Date):(a) all money and other Property of any kind, whether or not in the possession or under the control of Lender or a bailee of Lender; (b) all cash and non-cash proceeds of (a) above, including proceeds of and unearned premiums with respect to insurance policies insuring any of the Collateral; and (d) all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs, and other computer materials and records) of Borrower pertaining to any of (a) through (b) above.

   (g) **Super-priority Claim**. The Debtor has agreed to grant the Lender an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, which claim will have priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtor, now in existence or hereafter incurred by the Debtor and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1) and/or 726 of the Bankruptcy Code (the "Superpriority Claim"), provided, however, that the Superpriority Claim will be subordinate to (i) the Carve-Out and (ii) the fees payable to the United States Trustee, as set forth in the Interim Order

   (h) **Default**. All Obligations shall be, at Lender's option, due and payable without notice or demand upon termination of this Agreement or upon the occurrence of any one or more of the following events of default:  (a) Borrower shall fail to pay (i) the principal of or accrued interest with respect to any Post-Petition Loan on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise) or within three Business Days of such due date or (ii) any of the other Obligations on the due date thereof (whether due at stated maturity, upon acceleration or otherwise), but if no due date is specified therefor, within three Business Days after demand for payment of such Obligation; (b) Any warranty, representation, or other statement made or furnished to Lender by or on behalf of any Borrower or any other Obligor or in any instrument, certificate or financial statement furnished in compliance with or in reference to this Agreement or any of the DIP Financing Documents proves to have been false or misleading in any material respect when made or furnished;(c) Any Borrower or any other Obligor shall fail or neglect to perform, keep or observe any covenant contained in Section 1.l(b), Section 6.4, Section 7.1(a),  Section 7.1(b), Section 7.4(b), Section 7.5(a),

Section 9.1(a), Section 9.l(c), Section 9.l(d), Section 9.1(e), Section 9.1(g), Section 9.1(i), Section 9.1(t), Section 9.l(k) or Section 9.2 hereof on the date that such Borrower or such Obligor is required to perform, keep or observe such covenant; (d) Borrower or any other Obligor shall fail or neglect to perform, keep or observe any covenant contained in this Agreement (other than a covenant which is dealt with specifically elsewhere in Section 11.1 hereof) and the breach of such other covenant is not cured to Lender's satisfaction within 10 days after the sooner to occur of Borrower's receipt of notice of such breach from Lender or the date on which such failure or neglect first becomes known to Borrower; provided that if any such breach is of a nature that is not reasonably susceptible of cure within such 5-day period, no Event of Default shall be deemed to have occurred hereunder by reason thereof so long as Borrower commences to cure such breach within such 5-day period and thereafter diligently pursue such cure to completion within an additional 5-day period; and provided further, however, that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any covenant which is not capable of being cured at all or within such 5-day period or which is a willful and knowing breach by Borrower or such Obligor; (e) Any event of default shall occur under, or Borrower or any other Obligor shall default in the performance or observance of any term, covenant, condition or agreement contained in, any of the other DIP Financing Documents and such default shall continue (i) beyond any applicable period of grace, or (ii) if no grace period is specified within such DIP Financing Documents, within 5 days after the sooner to occur of Borrower's receipt of notice of such breach from Lender or the date on which such failure or neglect first becomes known to any Senior Officer; (f) There shall occur any default or event of default on the part of any Borrower or any other Obligor under any agreement, document or instrument which is entered into after the Petition Date and which relates to any Debt; (g) There shall occur any material loss, theft, damage or destruction not fully covered by insurance (as required by this Agreement and subject to such deductibles as Lender shall have agreed to in writing), or any sale, lease or encumbrance of any of the Collateral or the making of any levy, seizure, or attachment thereof or thereon, except as may be specifically permitted by other provisions of this Agreement; (h) Borrower shall fail to comply with any of the provisions of the Financing Order in any material respect; a trustee shall be appointed in any Chapter 11 Case; an examiner shall be appointed in any Chapter 11 Case with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; any Chapter 11 Case shall be dismissed or converted to a case under Chapter 7; there shall be filed by Borrower any motion to sell all or a substantial part of the Collateral on terms that are not acceptable to Lender in its sole discretion; the Financing Order is not entered by February __, 2010; Borrower shall file any motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, the Financing Order or, without Lender's prior written consent, either of the Financing Order is amended, vacated, stayed, reversed or otherwise modified; the Court shall enter an order granting to any Person (other than Lender) relief from the automatic stay to foreclose upon a Lien with respect to any Property of Borrower that has an aggregate book value in excess of $50,000 which Property is necessary for the operation of the Borrower's business or to terminate or otherwise exercise remedies under any material agreement, document or instrument which is entered into after the Petition Date, whether or not it relates to any

Debt; Borrower shall file a motion or other request with the Court seeking authority to use any cash proceeds of the Collateral or to obtain any financing under Section 364(c) or Section 364(d) of the Bankruptcy Code or otherwise secured by a Lien upon any Collateral (in each case (i) without Lender's prior written consent or (ii) if such motion fails to contemplate payment in full of the Obligations); or, without Lender's consent, any Obligor shall discontinue or suspend all or any material part of its business operations or commence an orderly wind-down or liquidation of any material part of the Collateral; (i) Any material covenant, agreement or obligation of any Obligor contained in or evidenced by any of the DIP Financing Documents shall cease to be enforceable or shall be determined to be unenforceable in accordance with its terms other than by reason of Lender's actions; any Obligor shall deny or disaffirm its obligations under any of the DIP Financing Documents or Liens granted in connection therewith; any Obligor shall initiate or support (in any such case by way of any motion or other pleading filed with the Court or any other writing to another party-in-interest executed by or behalf of an Obligor) any other Person's opposition of or challenge to the enforceability, validity and priority of the DIP Financing Documents or the Liens granted thereby; or the Liens granted in any of the Collateral owned by any Obligor shall be determined to be voidable, invalid or subordinated or shall be determined, with respect to any material part of the Collateral owned by any Obligor, to be unperfected or not to have the priority contemplated by this Agreement; (j) Any Guarantor shall be in default under the terms of any agreement, document or instrument which relates to any Debt for Money Borrowed; or any Insolvency Proceeding shall be commenced by or against any Guarantor; (k) Any Material Contract shall be terminated or amended in any material respect without the prior written consent of Lender, unless said contract is concurrently replaced with a comparable agreement on comparable terms.

(i) **Interest Rate.** The interest rate on the outstanding obligations shall be 12%. During and after an event of Default, the interest rate shall be the greater of 20% per annum or the maximum non-usurious rate permitted by law.

(j) **Termination.** (a) Lender may terminate the DIP Facility (and any Commitment thereunder) at any time, without notice to Borrower, after the occurrence and during the continuance of an Event of Default and (b) Borrower may terminate the DIP Facility at any time upon 10 days prior written notice to Lender; provided, however, no such termination by Borrower shall be effective until Full Payment of the Obligations. Any notice of termination given by Borrower shall be irrevocable unless Lender otherwise agrees in writing. Borrower may elect to terminate the DIP Facility in its entirety only. Effect of Termination. On the Commitment Termination Date, all of the Obligations shall be immediately due and payable, and Lender shall have no further obligation to make any Post-Petition Loans. All undertakings, agreements, covenants, warranties and representations of Borrower contained in the DIP Financing Documents shall survive any such termination and Lender shall retain its Liens in the Collateral and all of its rights and remedies under the DIP Financing Documents notwithstanding such termination until Full Payment of the Obligations. The provisions of Section 2.4, Section 4.4, and this Section 5.2(c) and all obligations of Borrower to indemnify Lender pursuant to this Agreement shall in all events survive any termination of the Commitment.

(k) **Loan Administration.** Borrowings under the Commitment established pursuant to Article 1 hereof shall be made and funded as follows: (a) Whenever Borrower desires to make a Borrowing under this Agreement, Borrower shall give Lender prior written notice of such Borrowing request (a "Notice of Borrowing"), which shall be in the form of Exhibit B annexed to the Agreement. Except for the initial Notice of Borrowing, such Notice of Borrowing shall be given by Borrower no later than 11:00 a.m., New York, New York time, at the office of Lender, as designated by Lender from time to time at least three (3) Business Days prior to the requested funding date of such Borrowing, but no more frequently than once per week. Notices received after 11:00 a.m. shall be deemed received on the next Business Day. Each Post-Petition Loan shall be in the minimum amount of $15,000.00 (unless deemed requested pursuant to Section 3.l(a)(ii) or otherwise agreed by Lender). Each Notice of Borrowing shall be irrevocable and shall specify (A) the principal amount of the Borrowing, (B) the date of Borrowing (which shall be a Business Day) and (C) the proposed use of the proceeds thereof. Unless payment is otherwise timely made by Borrower, the becoming due of any amount required to be paid under this Agreement or any of the other DIP Financing Documents with respect to the Obligations (whether as principal, accrued interest, fees or other charges) shall be deemed irrevocably to be a request for a Post-Petition Loan on the due date of, and in an aggregate amount required to pay, such principal, accrued interest, fees or other charges, and the proceeds of such Post-Petition Loan may be disbursed by way of direct payment of the relevant Obligation. Subject to its receipt of a Notice of Borrowing as provided in Section 3.1(a)(i), and in compliance with the terms and conditions hereof, Lender shall make the proceeds of the Post-Petition Loan available to Borrower by disbursing such proceeds in accordance with Borrower's disbursement instructions set forth in the applicable Notice of Borrowing. Borrower irrevocably authorizes Lender to disburse the proceeds of each Post-Petition Loan requested by Borrower, or deemed to be requested pursuant to Section 3.1(a), as follows: (i) the proceeds of each Post-Petition Loan requested under Section 3.1(a)(i) shall be disbursed by Lender in accordance with the terms of the Notice of Borrowing; and (ii) the proceeds of each Post-Petition Loan requested or deemed requested under Section 3.1(a)(ii) shall be disbursed by Lender by way of direct payment of the relevant interest or other Obligation. Any proceeds disbursed in payment of any of the Obligations shall be deemed to have been received by Borrower.

(l) **Fees and Expenses.**

    (i)        Facility Fee: .35% of the Commitment,

    (ii)      Reimbursement Obligation. Borrower shall reimburse Lender for all reasonable legal, accounting, appraisal and other fees and expenses incurred by Lender and other items set forth in section 2.4 of the Debtor in Possession Credit Agreement

    (iii)     Bank Charges. Borrower shall pay to Lender, on demand, any and all fees, costs or expenses which Lender pays to a

bank or other similar institution arising out of or in connection with the loan

(o) **Covenants:** Affirmative covenants set forth in Section 9 of the Debtor in Possession Credit Agreement including but not limited to providing financial statements, maintenance of insurance, compliance with all applicable laws, payment of applicable taxes.

(p) **Retention of Controller.** During the DIP Term and thereafter until Full Payment of the Obligations, the Obligors shall employ a Controller designated by the Lender in its sole and absolute discretion. The Controller shall be responsible for day-to-day oversight of the Borrower's financial affairs. Nothing contained herein shall obligate the Controller to ensure that Borrower is in compliance with the terms and conditions set forth in the DIP Financing Documents nor shall the Controller have any liability in the event that any Obligor is found to be in breach of the DIP Financing Documents. The Controller shall be paid a commercially reasonable rate and shall have full signing authority on all of Borrower's bank accounts.

(q) **Retention of Security Officer.** During the DIP Term and thereafter until Full Payment of the Obligations, the Obligors shall employ a Security Officer designated by the Lender in its sole and absolute discretion. The Security Officer shall be responsible for supervising and ensuring the security of the Collateral. The Security Officer shall be paid a commercially reasonable rate.

(p) **Negative Covenants.** During the DIP Term and thereafter until Full Payment of the Obligations, each Obligor covenants that it shall not and shall not permit any Subsidiary to:

(1) Fundamental Changes. Merge or consolidate with any Person, acquire a material amount of assets of any Person, or liquidate, wind up its affairs or dissolve itself;

(2) Limitation on Liens. Create or suffer to exist any Lien upon any of its Property, income or profits, whether now owned or hereafter acquired, except: (i) Liens in existence on the Petition Date as disclosed on Schedule 9.2(b) and not required to be terminated as noted thereon; (ii) Liens for Taxes (excluding any Lien imposed pursuant to any of the provisions of ERISA) not yet due or being Properly Contested; (iii) statutory Liens (excluding Liens imposed pursuant to any of the provisions of ERISA) securing the claims or demands of materialmen, mechanics, carriers, warehousemen, landlords and other like Persons for labor, materials, supplies or rentals incurred in the Ordinary Course of Business, but only if the payment thereof is not at the time required or the Debt secured by such Lien is being Properly Contested; (iv) Liens resulting from deposits made in the Ordinary Course of Business in connection with workmen's compensation, unemployment insurance, social security and other like laws; (v) reservations, exceptions, easements, rights-of-way, and other similar

encumbrances affecting real Property of any Obligor that were in existence on the Petition Date; (vi) Liens securing Permitted Purchase Money Debt; and (vii) such other Liens as Lender may consent to in writing from time to time, in its sole and absolute discretion.

(3) Disposition of Assets. Except as contemplated by the Acquisition Agreement, sell, lease or otherwise dispose of any of their Property, including any disposition of the Collateral as part of a sale and leaseback transaction, to or in favor of any Person, except (i) dispositions of Property that are authorized by the Court after notice and hearing, provided that the Net Proceeds thereof are remitted to Lender for application to the Obligations as provided herein, or (iv) dispositions which result in Full Payment of all of the Obligations and (v) the rejection pursuant to Section 365 of the Bankruptcy Code of unexpired leases and executory contracts.

(4) Compromise of Accounts. Compromise or settle, or extend the time of payment of, any Account in excess of $2,000 without Lender's prior written consent.

(5) Payment of Claims. Make any payment of principal or interest on account of any Claim against any Obligor that arose prior to the Petition Date.

(6) Filing of Motions and Applications. Apply to the Court for authority to (i) take any action that is prohibited by the terms of any of the DIP Financing Documents, (ii) refrain from taking any action that is required to be taken by the terms of any of the DIP Financing Documents or the Financing Orders (iii) permit any Debt or Claim to be pari passu with or senior to any of the Obligations, or (iv) use any cash proceeds of the Collateral other than in payment of the Obligations or as otherwise expressly authorized herein.

(7) Modifications to Orders. Seek or consent to any amendment, supplement or any other modification of any of the terms of the Financing Orders.

(8) Distributions. Make any Distribution except as otherwise expressly permitted by the Budget.

(9) Permitted Debt. Incur or suffer to exist any Debt other than Claims and Debt in existence on the Petition Date or the Obligations.

(10) Conduct of Business. Engage in any business other than the business engaged in by it on the Petition Date and any business or activities that are substantially similar, related or incidental thereto.

(11) Use of Proceeds. Use any proceeds of Post-Petition Loans for a purpose that is not expressly permitted by Section 1.1(b).

(12) Accounting Changes. Change any method of accounting or accounting practice used by it, except for any change required by GAAP or Applicable

Law.

(13) <u>Organization Documents</u>. Amend, modify or otherwise change any of the terms or provisions in any of its Organization Documents as in effect on the date hereof.

(14) <u>Budget</u>. Make or commit or agree to make any expenditures in any given week or on a cumulative basis which are not set forth in the Budget, subject to cumulative variances not to exceed five percent (5%) of such aggregate expenditures.

(15) <u>Price/Credit Term Adjustments</u>. Modify the Pricing Schedule or grant, extend or amend credit terms in place between the Borrower and its customers.

**The Proposed DIP Financing Arrangement Should be Authorized**

20.      The Debtor's ability to meet its working capital needs and avail itself of the opportunity to reorganize its business can be satisfied only if the Debtor is authorized to borrow up to $400,000 under the Debtor in Possession Credit Agreement and to use such proceeds to fund the operations of the Debtor.

21.      The credit provided under the Debtor in Possession Credit Agreement will enable the Debtor to expand its operations, continue monthly adequate protection payments on their existing obligations, pay their employees, vendors, and suppliers, and operate their businesses and in an orderly and reasonable manner to preserve and enhance the value of its assets and enterprise for the benefit of all parties in interest. Moreover, the availability of credit under the Debtor in Possession Credit Agreement will provide employees, vendors, and suppliers and other parties with confidence in the Debtor that will enable and encourage them to resume ongoing credit relationships with the Debtor. Finally, the implementation of the Debtor in Possession Credit Agreement will be viewed favorably by the Debtor's employees and outside parties and thereby help promote the Debtor's successful reorganization.

**Approval Under Section 364(d) of the Bankruptcy Code.**

24.     The Debtor proposes to obtain financing under the Debtor in Possession Credit Agreement by providing security interests and liens as set forth above pursuant to Sections 364(d) of the Bankruptcy Code. The statutory requirement for obtaining post-petition credit under Section 364(d) is a finding, made after notice and hearing, that the debtors are "unable to obtain such credit otherwise and there is adequate protection of the holder of the lien on property of the estate on which the senior or equal lien is proposed to be granted.

25.     The Debtor bears the burden of proof on the issue of adequate protection with respect to the lien which is being primed.

### The Debtor Does Not Have An Alternative to the DIP Facility.

26.     As will be shown at the Interim Hearing, a working capital facility of the type needed in this case could not have been obtained on an unsecured basis or on a secured basis without the imposition of a priming lien. As will be shown, potential sources of the proposed DIP Financing for the Debtor, obtainable on an expedited basis and on reasonable terms, were extremely limited. None of the alternative potential sources of post-petition financing proposed a facility that would meet the Debtor's working capital and expansion requirements. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986).

27.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364(c) and (d). Id.; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would

be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989). Thus, the evidence introduced at the Interim Hearing will satisfy the requirement of Section 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtor.

**Application of the Business Judgment Standard.**

28.     As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtor's management has concluded that the DIP Financing is the only alternative available in the circumstances of this case. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc. 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

29.     In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. In re Curlew Valley Assoc., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable

basis, and within the scope of [its] authority under the Code." Id. at 513-14 (footnotes omitted).

30.     The Debtor has exercised sound business judgment in determining that a post-Petition credit facility is appropriate and has satisfied the legal prerequisites to borrow under the DIP Financing. The terms of the DIP Financing are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted authority to enter into the DIP Financing and borrow funds from the DIP Lenders on the secured, administrative superpriority basis described above, pursuant to Section 364(d) of the Bankruptcy Code, and take the other actions contemplated by the Debtor in Possession Credit Agreement and as requested herein.

31.     Without the liquidity provided by the DIP Financing, the Debtor will be unable to pay suppliers, employees, and other constituencies that are essential to the orderly operation of their businesses. The Debtor's manager has exercised their best business judgment in negotiating the DIP Financing that is presently before the Court.

**The DIP Facility is Necessary to Effectively Preserve the Assets of the Debtor's Estate and to Operate Its Business**

32.     No party in interest can seriously contend that the Debtor does not need immediate access to a working capital facility. As with most other businesses, the Debtor has significant cash needs. Accordingly, access to credit is necessary to meet the day-to-day costs associated with maintaining business relationships with the Debtor's vendors and suppliers, purchasing new inventory, and otherwise financing their operations. Access to sufficient cash is therefore critical to the Debtor. In the absence of immediate access to cash and credit, the Debtor's suppliers will refuse to sell critical supplies and services to the Debtor, and the Debtor will be unable to operate its business. The inability

to meet payments to vendors and satisfy customers' desires for particular product would seriously impair the Debtor's prospects for reorganization.

33.     For these reasons, access to credit under the DIP Financing is critical. The Debtor cannot wait for the beneficial effects of the DIP Financing; any substantial delay could have the same impact as denial of the Motion. The Debtor's need for access to the DIP Financing therefore is immediate.

**The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate and provide Adequate Protection to Existing Lienholders.**

34.     The Debtor is unable to obtain unsecured credit allowable solely as an administrative expense. The Debtor is also unable to secure secured credit without offering to the potential lender a senior first priority lien in its assets. The proposed DIP Financing reflects the exercise of sound and prudent business judgment. The Debtor would not have been able to obtain financing on an unsecured basis, or otherwise. In the Debtor's business judgment, the DIP Financing is the best financing option available in the circumstances in these cases.

35.     The proposed terms of the DIP Financing are fair, reasonable and adequate in that these terms neither (a) tilt the conduct of this case and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits. The purpose of the DIP Financing is to enable the Debtor to meet ongoing operational expenses.

36.     The proposed DIP Financing provides that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve-Out. In Ames Dep't Stores, 115 B.R. 346 (Bankr. S.D.N.Y. 1990), this Court found that such

"carve-outs" are not only reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40.

38.     Likewise, the various fees and charges required by the DIP Lender under the DIP Financing are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Section 364 of the Bankruptcy Code. See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement fee").

39.     The terms and conditions of the Debtor in Possession Credit Agreement are fair and reasonable, and were negotiated by the parties in good faith and at an arm's length. Accordingly, the DIP Lender under the Debtor in Possession Credit Agreement should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of such agreement.

40.     The fairness and reasonableness of the terms of the DIP Financing will be further shown at the Interim and Final Hearings.

41.     The Debtor is not seeking authorization for the Lender to obtain a senior position on the Debtors' real estate but rather is taking a lien subject to existing liens on the Debtor's real property. The Debtor is seeking authority for the Lender to obtain a priming lien on the Debtor's personal property and has received the consent of the secured lender, First Pioneer, to the request for the priming lien, subject to certain protections. First Pioneer, pursuant to its filed proof of claim holds a claim in the amount of $875,913.00 which claim is secured by collateral in the form of real estate valued at $1,200,000. First Pioneer also holds a lien on the Debtor's personal property

which is valued on the Debtor's schedules in the aggregate amount of $1,713,000.

Debtor has also obtained consent from First Pioneer for the use of cash collateral through

Tuesday, February 23, 2010 and is in the process of negotiating the terms of a cash

collateral stipulation with First Pioneer.

**Request for Immediate Interim Relief.**

42.     Pending the Final Hearing, the Debtor requires immediate use of Cash

Collateral and financing for, among other things, their purchase of inventory,

maintenance of their facilities, and other working capital needs. It is essential that the

Debtor immediately stabilize their operations and resume paying for ordinary, post-

petition operating expenses to minimize the damage occasioned by their cash flow

problems.

43.     Absent immediate use of Cash Collateral and financing, the Debtor will be

unable to pay ongoing operational expenses. Consequently, if interim relief is not

obtained, the Debtor's assets will be immediately and irreparably jeopardized, to the

detriment of their estates, their creditors and other parties in interest.

44.     Accordingly, the Debtor requests that, pending the Final Hearing, the

Court schedule the Interim Hearing as soon as practicable to consider the Debtor's

request for authorization to use cash collateral and obtain interim credit in an amount up

to $200,000 under the DIP Financing, in accordance with and pursuant to the terms and

conditions contained in the Debtor in Possession Credit Agreement and the Interim

Order.

45.     Bankruptcy Rules 4001(b) and 4001(c) permit a court to approve a

debtor's request for financing during the 15-day period following the filing of a motion

requesting authorization to obtain post-petition financing, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., In re Simasko Prod. Co., 47 B.R. at 449; see also In re Ames Dep't Stores, 115 B.R. at 38. After the 15-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business. A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. See, e.g., In re Simasko Prod. Co., 47 B.R. at 449; In re Ames Dep't Stores, 115 B.R. at 36.

## Notice

46.     Pursuant to Sections 102(1), 363(c), and 364(c) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), notice of this Motion has been provided via overnight delivery service to the lender, the Debtor's secured creditors, the Debtor's 20 largest unsecured creditors, the Office of the United States Trustee, and all parties having filed notices of appearance.

47.     The Debtor will, within three (3) business days of the entry of the Interim Order by the Court, serve by United States mail, first class postage prepaid, copies of this Motion, the Interim Order and a notice of the Final Hearing (the "Final Hearing Notice") to consider entry of the proposed Final Financing Order on: the Office of the United States Trustee, the lender, the Debtor's secured creditors, the Debtor's 20 largest unsecured creditors, all parties having filed notices of appearance, and any other parties as directed by the Court.

## Waiver of Memorandum of Law

48.     Since there is no novel issues of law presented herein, the Debtor respectfully requests that the Court waive the requirement that the Debtor file a memorandum of law in support of this Motion. The Debtor reserves the right to file a memorandum of law prior to the Final Hearing.

**WHEREFORE**, the Debtor respectfully requests that the Court:

(a)     enter the Interim Order and set the date for the final hearing;

(b)     enter the Final Financing Order; and

(c)     grant the Debtor such other and further relief as is just and proper.

**DATED:**   New York, New York
            February 18, 2010

                                    **ROBINSON BROG LEINWAND**
                                    **GREENE GENOVESE & GLUCK P.C.**


                                    By: /s/ A. Mitchell Greene
                                        **A Mitchell Greene (AMG-5900)**
                                        **Attorneys for the Debtor**
                                        1345 Avenue of the Americas
                                        New York, New York 10105-0143
                                        (212) 603-6300